# AFFIDAVIT FOR SEARCH WARRANT

Commonwealth of Virginia

VA. CODE § 19.2-54

The undersigned Applicant states under oath:

1. A search is requested in relation to [X] an offense substantially described as follows:
   [ ] a person to be arrested for whom a warrant or process for arrest has been issued identified as follows:

   Virginia State Code: 18.2-58 Robbery
   Virginia State Code: 18.2- Use of a Firearm in the Commission of a Felony

   .............................................................................................. [ ] CONTINUED ON ATTACHED SHEET

2. The place, person or thing to be searched is described as follows [ ] and is a place of abode:

   Records and information associated with the cellular device assigned to IMSI: 310240191284283 and IMEI: 355979082444502 ("the Account"), that are stored at premises controlled by T-Mobile ("the Provider"), headquartered at 4 Sylvan Way, Parsippany, NJ 07054. The records requested are actually or constructively possessed by a foreign corporation that provides electronic communication or remote computing services within the Commonwealth of Virginia.

   .............................................................................................. [ ] CONTINUED ON ATTACHED SHEET

3. The things or persons to be searched for are described as follows:

   See Attachment I

   .............................................................................................. [ ] CONTINUED ON ATTACHED SHEET

---

FILE NO. 04CM2200 9250

## AFFIDAVIT FOR SEARCH WARRANT

APPLICANT: .....................................................

J.P. Hylon
NAME

Corporal Detective
TITLE (IF ANY)

P.O. Box 148
ADDRESS

Chesterfield, VA 23832

.........................................................................
TITLE                                    SIGNATURE

on ..................................................................
    CITY OR COUNTY                        DATE

Certified to Clerk of .......................... Circuit Court

Original Delivered [ ] in person  [ ] by certified mail
                   [ ] by electronically transmitted facsimile
                   [ ] by use of filing/security procedures
                       defined in the Uniform Electronic
                       Transactions Act

to Clerk of ......................................................
              CITY OR COUNTY WHERE EXECUTED          Circuit Court

on ..................................................................

........................................................................
TITLE                    DATE                    SIGNATURE

---

(OVER)

4. The material facts constituting probable cause that the search should be made are:
See Attachment II

5. The object, thing or person to be searched for [X] constitutes evidence of the commission of such offense [ ] is the person to be arrested for whom a warrant or process for arrest has been issued.

6. [ ] Authorization to execute a search warrant of a place of abode other than in the daytime hours between 8:00 a.m. and 5:00 p.m. is requested. The material facts constituting good cause for such authorization are:

[ ] Reasonable efforts were made to locate a judge, and a judge is not available, before seeking authorization from a magistrate to execute a search warrant other than in the daytime hours between 8:00 a.m. and 5:00 p.m., with those reasonable efforts being as follows:

OR [ ] Reasonable efforts were not made to locate a judge as the following circumstances require the issuance of the search warrant after 5:00 p.m.:

7. [X] I have personal knowledge of the facts set forth in this affidavit AND/OR
[X] I was advised of the facts set forth in this affidavit, in whole or in part, by one or more other person(s). The credibility of the person(s) providing this information to me and/or the reliability of the information provided may be determined from the following facts:

See Attachment III

_____
APPLICANT

The statements above are true and accurate to the best of my knowledge and belief.

Corporal Detective
_____
TITLE OF APPLICANT

Subscribed and sworn to before me this day.

12/19/22   1401
_____
DATE AND TIME

[ ] CLERK    [X] MAGISTRATE    [ ] JUDGE

12/19/2022

**ATTACHMENT I.**

**THE THINGS OR PERSONS TO BE SEARCHED FOR**

1. **Information to be Disclosed by the Provider:**

   To the extent that the information described in Section Two (2) of the attached affidavit is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Section Two (2) of the attached affidavit for the time period of **September 1, 2022; 12:01 AM (EDT) to November 9, 2022; 11:59 PM (EDT):**

   a. The following information about the customers or subscribers of the Account:

      i. Names (including subscriber names, user names, and screen names);

      ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

      iii. Local and long-distance telephone connection records;

      iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

      v. Length of service (including start date) and types of service utilized;

      vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

       vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

      viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

    i.   the date and time of the communication, the method of the communication (including whether communication is voice, text, or data), and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    ii.   information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received;

    iii.   **information regarding the location of the cellular device described in Section Two (2) of the attached affidavit, including information regarding the device's latitude and longitude and distance to tower (known as timing advance information).**

2.  **Information to be Seized**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of **VA Code 18.2-58 (robbery) and 18.2-53.1 (Use of a Firearm in Commission of a Felony)** involving PAUL DAY during the period of **September 1, 2022; 12:01 AM (EDT) to November 9, 2022; 11:59 PM (EDT).**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

**THE MATERIAL FACTS CONSTITUTING PROBABLE CAUSE**

1.     On 09/29/2022 at approximately 3:53 PM (EDT), an unknown subject (USBUB), later determined to be PAUL GORDON DAY (hereinafter "DAY"), entered the First Community Bank, located at 11400 Midlothian Turnpike, North Chesterfield, VA 23235. Upon entry, DAY approached victim-teller G.S., who was positioned behind a counter and seated next to associate/employee, M.H. Upon approach, DAY produced an all-black semi-automatic handgun and demanded the following, "This is a robbery, give me all the 20s, 50s, and 100s." In compliance, G.S. provided DAY with $11,340.00 in US currency belonging to the victim bank. Prior to leaving, DAY placed the stolen currency within his pockets, returned the firearm to his waist band, and left the area on foot at approximately 3:54 PM (EDT).

2.     Following DAY's departure, law enforcement personnel responded to the scene and a K-9 track was conducted. K-9, "Samson," began by tracking East through the parking lot towards Jared the Galleria of Jewelry (11230 Midlothian Turnpike). Before getting to Jared's, Samson turned North and tracked towards Men's Warehouse (11358 Midlothian Turnpike), and then East to the rear of Bruce's Super Body Shop (11200 Midlothian Turnpike). From there, Samson went through the grass field North of Bruce's and continued the same direction behind the stores on Carmia Way (Burn Boot Camp, Staples, and PetSmart). Samson continued North until getting to the Southwest corner of the Home Depot parking lot (1386 Carmia Way), approximately **.3 miles from the victim-bank.** Hugging the edge of the parking lot, Samson turned West to 1221 Mall Drive and followed the tree line behind the business park. Samson ended the track near **1207 Mall Dr,** where he appeared to have lost the DAY's scent (K-9 track indicated in the below Google Map images, labeled *Attachments A and B*).

*Attachment A.*



*Attachment B.*



3.      Upon investigative response to the scene, your Affiant interviewed G.S. and reviewed surveillance video of the robbery.  According to victim account and surveillance review, DAY was described as a W/M of slim build and average height (approximately 5'8-9"), brown hair, and between 40-50 years of age.  Furthermore, wearing a gray five panel/flat cap, sunglasses, white medical-style mask, light colored dress shirt, dark colored blazer jacket (dark blue or black), black "mechanics" gloves with white lettering, khaki pants, white socks, and brown squared-toe dress shoes.  The firearm DAY produced appeared to be an all-black semi-automatic handgun with silver barrel, modeled in the likeness of a "1911" **(See *Attachments C, D, and E*)**.

*Attachment(s) C. and D.*



*Attachment E.*



4.      After clearing from the bank, investigators began gathering surveillance video from surrounding businesses, such as the Chesterfield Towne Center (11500 Midlothian Turnpike), Men's Warehouse (11358 Midlothian Turnpike), Sherwin Williams (11390 Midlothian Turnpike), JC Penney's (11500 Midlothian Turnpike), Ross Dress for Less (11330 Midlothian Turnpike), Jared (11230 Midlothian Turnpike), Bruce's Super Body Shops (11200 Midlothian Turnpike), The Village Children & Family Services (1233 Mall Drive), Impact (1235 Mall Drive), and AAA Auto Repair Shop (11261 Mall Place).  A comprehensive review of said video allowed your Affiant to better understand the path DAY took to rob the bank and flee to a nearby getaway vehicle; furthermore, the timeframe during which these events occurred, **3:23 PM – 4:08 PM (EDT) \*\*allowing time for DAY to arrive at his staging location, travel to and from the victim-bank, and flee the area within a vehicle.\*\*** Likewise, video review corroborated the K-9 track and brought context as to DAY's whereabouts while not on camera.

5.     Having reviewed the aforementioned data, as well as having walked the K-9's path on at least three (3) occasions, it is your Affiant's belief that DAY parked somewhere **between 1207 Mall Drive** and the Home Depot parking lot at approximately **3:23 PM (EDT),** entered the bank to commit the robbery at **3:53 PM (EDT),** and returned to his vehicle and fled the area no later than **4:08 PM (EDT).**  Additionally, DAY's chosen path would not have been known to the general public, as multiple wooded "cut-throughs" and walking paths were used to travel the route in question.  See ***Attachment F.*** for clarity (red line depicts DAY's likely path from his vehicle to the bank and green depicts DAY's likely path from the bank to his vehicle).

*Attachment F.*



6.      In your Affiant's training and experience, the complexity of DAY's choices throughout the captioned matter indicate that the DAY did not commit the robbery on a whim. Subsequently, it is probable DAY inspected the route he was to take electronically and/or physically prior to committing the robbery. This was likely accomplished using mapping software, application(s), or similar technology as found on a mobile device or computer. While attempting to locate discarded evidence or additional surveillance cameras following the robbery, your Affiant used Google Maps to help navigate back to the victim-bank and/or his work vehicle on several occasions. Likewise, it is probable that similar or the same software was used by DAY and/or unknown conspirator(s) to flee the area without confusion, as fine motor skills and navigation become more difficult under stressful circumstances. In the event a getaway driver or lookout was utilized in the commission of the robbery, it is probable DAY used a cellular phone to communicate with the unknown conspirator to plan/coordinate the robbery and affect their escape.

7.      On 12/06/2022, your Affiant applied for and obtained a T-Mobile timing-advance/tower dump search warrant (executed via electronic service on 12/08/2022). In context of the previously sought data, it is important to note that on the date/time of the robbery, the aforementioned mapped areas were more scarcely populated due to the time of day, and the impending arrival of Hurricane Ian. Furthermore, the only parties present at the victim-bank during the time of the robbery, excluding DAY himself, were employees of the branch, who have consented to the collection of their cellular records and Google geolocation data in hopes of identifying/arresting a dangerous criminal and continued threat to public safety. The scope of previously sought tower records focused on areas DAY travelled, the time period for which he was likely in them and was only as large as absolutely needed to identify DAY, possible conspirator(s), and any unidentified witnesses.

8.      On 12/07/2022, your Affiant travelled to the Asheville Police Department headquarters (Asheville, NC), to meet with Detective A. Roach. Upon arrival, your Affiant was briefed on a PNC

Bank robbery occurring on 11/09/2022 (See ***Attachment G and H*** below). Subsequent to US currency and a GPS tracking device being taken from the victim-bank, DAY's vehicle, a Kia Sportage (TN: 044BBFQ), was stopped by law enforcement officials, who found him to be the sole occupant. Following his arrest, DAY invoked his right to counsel and refused to speak with investigators concerning the incident. When given the opportunity to make a phone call, DAY contacted his mother and confessed to having committed the robbery in question. Before conclusion of the call, DAY advised he had been staying in a Red Roof Inn (Room 227), Johnson City, TN. Furthermore, he needed "Wayne" to help him get his belongings from the room.

***Attachment G. and H.***



9.      Based on DAY's aforementioned statements, your Affiant learned that Asheville PD requested assistance from law enforcement officials in the Johnson City, TN area to respond to the Red Roof Inn.  As such, Tennessee Bureau of Investigations (TBI) Special Agent T. Garrison responded to the business on 11/10/2022.  Upon arrival, SA Garrison spoke with hotel staff, who advised Room 227's last occupant was DAY; however, the room should be vacant. Subsequently, staff requested law enforcement remove any possible occupants, should any be found.  Upon entry via a specialized device utilized by hotel staff, the room was found to be empty with evidence of DAY's extended stay (clothing, computer, notebook, perishable food, luggage, firearms, and evidence of drug use).

10.      Upon observing evidence consistent with a Nashville, TN bank robbery occurring on 09/09/2022 (a costume wig and a dress coat), law enforcement agents photographed Room 227 and collected several items of evidentiary value.  Subsequent to review, your Affiant located several items of clothing consistent with that which was worn by DAY during the captioned Chesterfield, VA bank robbery (pictured below).  Additionally, several flat caps consistent with the style worn by DAY during the captioned bank robbery were present in the hotel room and DAY's vehicle (vehicle search referenced in Paragraph 11).

*Attachment I.*



*Attachment(s) J. and K.*





*Attachment L.*



11.     Prior to leaving Asheville PD headquarters, your Affiant was also made aware of a search warrant executed on DAY's vehicle (pictured below). Following its execution, a black **Samsung Galaxy S8+** was found on the front passenger's seat within arm's reach of DAY, prior to his arrest. Upon request, your Affiant was allowed physical access to the device to document its associated serial numbers. Likewise, the following **IMEI** was located on the back/lower portion of the device: **355979082444502**, with Mint Mobile Sim card number 890124019 / 7112842831. Your Affiant did not power on DAY's device at any point during the examination.

*Attachment(s) M. and N.*





12.     Following the aforementioned meeting, your Affiant responded to the Buncombe County Detention Facility (Asheville, NC) to interview DAY. Upon arrival, DAY was advised of his rights pursuant to *Miranda.* Having understood said rights, DAY refused to speak with your Affiant without counsel being present. Before leaving the facility, your Affiant provided DAY with his

contact information and surveillance stills from the First Community Bank robbery (**Attachments C, D, and E**).

13.     On 12/08/2022 at 2:33 PM (EDT), DAY called his mother from a recorded line at the jail and had the following conversation:

a.)   DAY: "Apparently, there was a look-alike, some kind of look-alike crime up in Richmond.  A white guy went up in a bank, in his 30s or 40s, about my height and weight; about 5'10," 175lbs, and apparently, they're investigating that.  They haven't charged me with it, they haven't charged me, and I think it's ridiculous.  I saw the pictures and it's just a white guy, one out of 100,000 people."

b.) Mother: "Well Paul, they can tell if you were in the bank with your phone."

c.) DAY: "I hope they see my phone, my GPS, because I wasn't in that bank.  My freaking car wasn't anywhere around that bank, and it's just a look-alike kind of situation."

14.     On 12/09/2022 at 8:37 PM (EDT), DAY called his father and mother from a recorded line at the jail and had the following conversation:

a.) Father: "Hey, Paul."

b.) DAY: "Has the attorney talked to you about, ya know, the FBI, the whole Richmond investigation, the car, and rehab?  Those three things?  Updated or spoken about it today?"

c.) Father: "Well, we haven't talked to him today, but your mother and I looked at the pictures from Richmond and we can tell it's you.  You're wearing your white khaki pants, your light brown shoes..."

d.) DAY: "It wasn't me.  It's apparently a white male, 5'10," 175lbs or so, and I see dudes like that all the time!  Why are you trying to accuse me of something..."

e.) Father: "I'm telling you that your mother and I could recognize you from the pictures."

f.) DAY: "It's not me, it's not me. I've seen the pictures and I've looked at that dude's face and it's completely covered. The face is covered..."

g.) Father: "Did you know lying to the FBI is another crime?"

h.) DAY: "Look, it's not me. That individual in Richmond is a look-alike and case of mistaken identity, but if you're trying to throw me under the bus to make me sound bad online or whatever, then that's your little thing."


15.    On 12/14/2022, the sought T-Mobile tower dump records, as referenced in Paragraph Seven (7), were sent to your Affiant's email. A preliminary plotting of said data, shows that the cell phone in DAY's possession at the time of his arrest was in the area around the time of the robbery. The device in question is referenced in Paragraph 11 and is further described as a **Samsung Galaxy S8+**, with **IMEI: 355979082444502.** T-Mobile's return data provided the same information, with the addition of DAY's **IMSI: 310240191284283.** The below preliminary data shows that DAY's device was likely stationary at **3:44 and 3:48 PM (EDT)** around the area where the police K-9 lost his scent. Furthermore, the device appears to be leaving the area on Koger Center Blvd or Carmia Way at **3:59 PM (EDT).** This would be consistent with your Affiant's experience; wherein, violent criminals flee the area/scene of the crime immediately following the act (see **Attachment O.** for clarification).

*Attachment O.*



16.     Based on your Affiant's training and experience, he also knows that each cellular device is identified by one or more unique identifier(s).  For example, with respect to a cellular phone, the phone will be assigned both a unique telephone number but also one or more other identifiers such as an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").   The types of identifiers assigned to a given cellular device are dependent on the device and the cellular network on which it operates.

17.     In your Affiant's training and experience, he has learned that T-Mobile is a company that provides cellular access to the general public.  Your Affiant also knows that providers of cellular service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."   Cell-site data identifies the "cell

towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular device but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

18.     Based on your Affiant's training and experience, he knows that cellular service providers also store information about the location of cellular devices connected to their networks. This information can include a provider's estimation of the latitude and longitude of a cellular device, as well as information about the provider's confidence in the accuracy of that information. It can also include information about the estimated distance of a cellular device from the provider's tower. Cellular service providers use specific terms for their device location information. T-Mobile refers to it as timing advance information; whereas AT&T refers to it as LOCDBOR (Location Database of Record) information; and Verizon refers to it as RTT (Real Time Tool) information.

19.     Based on your Affiant's training and experience, he knows that T-Mobile can collect location data about the SUBJECT PHONE. He also knows that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

20.     Based on your Affiant's training and experience, he knows that cellular service providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless service. He also knows that cellular service providers such as T-Mobile typically collect and retain information about their subscribers' use

of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In your Affiant's training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or additional unknown victims (bank robberies not currently linked to DAY).

21.     Based on the facts and circumstances as referenced above, your Affiant finds it more than probable that DAY is responsible for the First Community Bank robbery in Chesterfield, VA. Furthermore, the requested data referenced in Attachment I, to include the sought date/time range of **September 1, 2022; 12:01 AM (EDT) to November 9, 2022; 11:59 PM (EDT)**, will aid your Affiant in proving/disproving that belief.

22.     Historical data, such as requested, will assist your Affiant with further establishing identity and confirming usage of the sought IMSI/IMEI/device. In past investigations, your Affiant has used similar records to determine where a suspect was staying around the time of a robbery, who he/she was conspiring with to commit an offense, where fruits or instruments of a crime were hidden after an incident, and where he/she frequented to affect an arrest. In the interest of the captioned matter, the firearm used in the Chesterfield robbery and possibly linked Nashville, TN bank robbery (occurring on 09/09/2022) was not found in DAY's vehicle or hotel room. Should the appropriate magistrate and/or judge find probable cause to issue the sought warrant, T-Mobile's return data may allow your Affiant to locate where DAY was staying at during his "visit" to Chesterferfield, VA, how long he stayed, and where he may have hidden or exchanged the firearm used in the Chesterfield and Nashville robberies. Furthermore, the sought data will provide a better understanding of DAY's planning/choices leading up to the robbery and may aid your Affiant in understanding DAY's involvement in any other area crimes or like bank robberies occurring prior to or after the First Community Bank robbery.

23.    Your Affiant believes that the records requested are actually or constructively possessed by a foreign corporation that provides electronic communications service or remote computing service within the Commonwealth of Virginia.

**ATTACHMENT III.**

**CREDIBILITY OF PERSONS PROVIDING PROBABLE CAUSE:**

1.      G.S., being an employee of First Community Bank, was the victim-teller of the robbery referenced herein.

2.      Out of State: Detective A. Roach is an investigator with the Asheville Police Department (Asheville, NC).  Special Agent (SA) T. Garrison in an investigator with the Tennessee Bureau of Investigations (Johnson City, TN).

3.      Your Affiant is a law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.  Your Affiant has over eleven (11) years of law enforcement experience stemming from employment as a police officer with the Chesterfield County Police Department.  Currently, your Affiant is a duly appointed Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) and has been so since December 2016.  Your Affiant is assigned to the Richmond FBI's Central Virginia Violent Crimes Task Force (CVVCTF), where his duties include investigating bank robberies, serial commercial robberies, extraterritorial offenses, armored car robberies, murder-for-hire matters, kidnappings, armed carjackings, and theft of government property.  Your Affiant has investigated numerous criminal violations and has obtained arrest and search warrants that have culminated in the successful prosecutions of their respective offenders.  The crimes your Affiant investigates are violent in nature and usually involve two or more individuals.  Your Affiant is familiar with the methods violent offenders use to conduct their illegal activities, to include, but not limited to their communication methods, use of electronic devices in the planning and execution of said offenses, use of additional co-conspirators, and reoccurring method of operation.  Throughout your Affiant's career, he has been through specialized training involving

violent offenses, such as homicides and robberies, wherein the evidentiary importance of cell phones and associated data were discussed in length. Your Affiant has personally participated in the investigation set forth herein.