IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:23-CR-00013-MR-WCM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| PAUL GORDON DAY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on the following:

1. Defendant's "Motion to Suppress and Memorandum in Support (Location)" (the "Motion to Suppress – Cash Tracker," Doc. 33); and

2. Defendant's "Motion to Suppress and Memorandum in Support (Hotel Room)" (the "Motion to Suppress – Tennessee Hotel Search," Doc. 36).

These motions have been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

I.  Relevant Procedural Background

On February 8, 2023, a Bill of Indictment was filed charging Paul Gordon Day ("Defendant") with one count of bank robbery in violation of 18 U.S.C. §2113 and one count of knowingly using, carrying, possessing, and brandishing a firearm in furtherance of a crime of violence in violation of 18 U.S.C. §924(c)(1)(A)(ii). Doc. 1.

1

On February 27, 2023, Defendant made an initial appearance.

On March 3, 2023, during his arraignment, Defendant pled not guilty and requested a jury trial. Defendant's trial was scheduled for May 1, 2023.

On April 21, 2023, at Defendant's request, his trial was continued to June 26, 2023. Doc. 16. On June 12, 2023, at Defendant's request, his trial was continued to August 28, 2023. Doc. 26.

On July 21, 2023, Defendant filed four Motions to Suppress. Docs. 33, 34, 35, and 36.[1]

On September 28, 2023, a hearing was conducted on all four motions. During those proceedings, the Court received evidence concerning the Motion to Suppress – Cash Tracker. See United States v. Taylor, 13 F.3d 786, 789 (4th Cir. 1994) ("When material facts that affect the resolution of a motion to suppress ... are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings.").

The parties were also given an opportunity to present oral argument with regard to all of the Motions to Suppress.

---

[1] The instant Memorandum pertains to two of the Motions. Separate Memoranda that address the remaining Motions are being filed simultaneously.

The day after the hearing on the Motions to Suppress, Defendant filed a reply to the Government's response to Defendant's Motion Suppress – Cash Tracker. Doc. 57.[2]

II. Factual Background

A. Evidence Presented

During the hearing, the Government called the following witnesses: 1) Rachel Hyatt, who is a teller with PNC Bank; 2) Patrol Sergeant Nicholas Shae of the Weaverville Police Department; and 3) Robert Stevens, a bureau chief with 3SI Security Systems ("3SI").

The Government also presented, without objection, the following exhibits: 1) video footage of the subject robbery; 2) an image of the front of a "bait bill"; 3) an image of the back of a "bait bill"; 4) police call logs; 5) footage from Sergeant Shae's body-worn camera; 6) a video produced by 3SI that showed the movement of the subject GPS device; and 7) a spreadsheet created by 3SI with additional information concerning transmissions from the GPS device.

Defendant did not call any witnesses but did submit, without objection, a two-page Case Supplemental Report from the Asheville Police Department (marked as DMTS 1); investigative notes from Detective Roach of the

---

[2] Subsequently, at Defendant's request, the trial was continued to January 3, 2024 and Defendant's request to represent himself was granted. Docs. 63, 64.

Asheville Police Department pertaining to an interview with Ms. Hyatt (marked as DMTS 2); and notes from an interview with another teller at PNC Bank, Melissa Pressley (marked as DMTS 3).

The Asheville Police Department's Event Report was also attached to the Motion to Suppress – Cash Tracker. Doc. 33-1.

### B. Factual Findings

Based on the information of record and as presented during the hearing, the undersigned finds the relevant facts to be as follows:

At approximately 4:15 p.m. on November 9, 2022, an individual entered the branch of PNC Bank (the "Bank") located at 8 O'Henry Avenue in Asheville, North Carolina, and approached the teller station where Ms. Hyatt was working. The individual was wearing a dark hat, glasses, gloves, and a mask, and appeared to be a male. In his right hand he held an object that appeared to be a handgun wrapped in some type of black plastic or tape-like material.

He demanded that Ms. Hyatt hand over currency in denominations of 20s, 50s, and 100s. Ms. Hyatt complied and removed currency from the cash drawer at her teller station and gave it to the suspect. She included with that currency a packet of $20 bills, which are known as "bait bills." Affixed to the bills, which were banded together, was a GPS tracking device.

4

Ms. Hyatt testified that she had been trained to use bait bills in the event of a robbery, that bait bills were located in the Bank's teller drawers at all times, and that the specific bait bills she used on November 9, 2022 had been placed in her drawer by the Bank's security team.

After the suspect obtained the currency from Ms. Hyatt, he told Ms. Hyatt to "get down" and she complied. Sometime later, when she stood up, the suspect was no longer in the Bank. Ms. Hyatt did not call the police directly or trigger a silent alarm but understood that bait bills were designed to activate an alarm when they were picked up.

Mr. Stevens is one of four bureau chiefs for 3SI and is responsible for overseeing 3SI's tracking of GPS devices in the eastern United States. He explained that the devices employed by banks use high sensitivity GPS receivers that are equipped with a battery, an RF transmitter, and a Wi-Fi receiver.

There are several ways a tracking device can be activated; it can be triggered remotely, or it can become active if it goes through a geo-fence. A device is also activated if it is removed from a magnetic plate, such as when a teller or a suspect reaches into a bank drawer and removes money to which the device is attached; a bank teller does not need to take any further action to activate the device. The device used in this case was activated when it was removed from Ms. Hyatt's teller drawer.

5

A device begins transmitting information within fifteen seconds of becoming active and transmits its heading, speed, and direction of travel every six seconds. The location information is accurate to within approximately ten to twelve feet.

Data from tracking devices used by 3SI's customers is transmitted to the company's command center in Pennsylvania. When the company receives an alert from a tracking device, company personnel contact local law enforcement to advise that the device is being actively tracked. Personnel at the command center may stay on the telephone with local law enforcement the entire time the device is being actively tracked, and transmissions from the device are provided to local law enforcement's dispatch center so dispatchers can follow the device's movements in real time. The company produces a tracker tool application that can be downloaded to any cellular phone so that individual law enforcement officers can also receive the real time data about the movements of a device that is being tracked.

At approximately 4:20 p.m. on November 9, 2022, 3SI's command center began tracking the bait bills that were taken from the Bank. At approximately the same time, the Asheville Police Department received a call regarding the robbery.

The dispatch center informed officers that an armed bank robbery had taken place and began relaying information regarding the location of the GPS device, which information was being provided by 3SI.[3]

At approximately 4:37 p.m., Sergeant Shae was in a marked vehicle near Exit 19 on Interstate 26, when he heard a call from dispatch that an armed bank robbery had occurred in Asheville and that a suspect was being tracked on Interstate 26 westbound toward Weaverville. He heard that the suspect's vehicle was approaching the Flat Creek exit (Exit 17), so Sergeant Shae began traveling west on Interstate 26. As Sergeant Shae drove, dispatch continually relayed information about the location of the suspect's vehicle and reported that the suspect was a white male and had a firearm.

Sergeant Shae traveled to the Forks of Ivy exit (Exit 13), where he left the interstate, since dispatch reported that the suspect was then moving down Stockton Branch Road. Sergeant Shae described the area as being rural, with only local traffic, and Stockton Branch Road as being a two-lane, "curvy, kind of country back road."

---

[3] No evidence was presented that any individual officers used 3SI's tracker tool application on November 9, 2022. Rather, the information regarding the movements of the device was sent to dispatch by 3SI and then relayed by dispatch to officers.

Sergeant Shae saw one vehicle on a nearby road but did not pursue that vehicle because its direction of travel was not consistent with the reports from dispatch regarding the device's direction of travel.

As Sergeant Shae continued traveling the route dispatch had described as having been followed by the device, he believed he was getting closer to the device because he was seeing side street names that dispatch had just identified.

Sergeant Shae then came upon a Kia Sportage with a Tennessee license tag. He saw no other vehicles moving in the same direction and did not have to pass any other vehicles. He noted that there was a single occupant in the vehicle.

Sergeant Shae followed the vehicle for approximately twenty to thirty seconds and then, after receiving no inconsistent information from dispatch, activated his emergency equipment. The Kia Sportage stopped at the intersection of Stockton Branch Road and Highway 197/Barnardsville Highway.

Another officer, who had been traveling behind Sergeant Shae, arrived shortly thereafter. The two of them drew their weapons, ordered the driver, who was later identified as Defendant, out of the car, and placed him in handcuffs.

Defendant was checked for weapons and asked for his identification, which was verified. The officers also found an open book bag with a firearm which appeared to be wrapped in some kind of material. Sergeant Shae observed a bicycle in the back seat of Defendant's vehicle.

Dispatch advised that 3SI was asking if the officers wanted the company to activate a "chirp alarm" on the tracking device. Sergeant Shae responded affirmatively, the alarm was activated, and Sergeant Shae heard an alarm inside the vehicle.

Numerous other law enforcement officers arrived at the scene and information was relayed, including that the suspect had used a bicycle to leave the Bank.

After the robbery, 3SI emailed the Asheville Police Department a spreadsheet showing the tracker's movement using latitude and longitude and recorded speed. 3SI also provided the Asheville Police Department with a map of the tracker's movements, which ended at the location where Defendant's car was stopped.

The tracker itself was owned by the Bank, while 3SI owned and managed the data stream from the device.

III. Discussion

   A. The Motion to Suppress—Cash Tracker

      1. Use of the Tracking Device as a Search for Purposes of the Fourth Amendment

"The Fourth Amendment provides in relevant part that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" United States v. Stephens, 764 F.3d 327, 331 (4th Cir. 2014). Therefore, "[t]he 'threshold question' in every Fourth Amendment case is whether a search or seizure occurred, and 'not every observation made by a law enforcement officer—even if consciously intended to disclose evidence of criminal activity—constitutes a search within the meaning of the Fourth Amendment.'" Id. (quoting United States v. Taylor, 90 F.3d 903, 908 (4th Cir.1996)).

Here, Defendant argues that the Government conducted an unconstitutional search of his location using data from the tracking device and therefore any evidence obtained following that search should be suppressed. In response, the Government contends that use of data from the tracking device did not constitute a search for purposes of the Fourth Amendment because (1) the data was given to the investigating officers voluntarily by a private party; and (2) Defendant had no reasonable expectation of privacy in the data.

10

### a. Government Action

"The Fourth Amendment is directed exclusively at state action" and therefore "evidence secured by private searches, even if illegal, need not be excluded from a criminal trial." United States v. Kinney, 953 F.2d 863, 865 (4th Cir. 1992) (citing Burdeau v. McDowell, 256 U.S. 465, 475 (1921); United States v. Mehra, 824 F.2d 297, 299 (4th Cir.), cert. denied, 484 U.S. 915 (1987)).

The Fourth Amendment does prohibit, though, unreasonable searches and seizures by "those private individuals acting as 'instruments or agents' of the Government." United States v. Jarrett, 338 F.3d 339, 344 (4th Cir. 2003) (citing U.S. Const. amend. IV; Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971)) (internal brackets omitted). In determining whether a private party acted as an instrument or agent of the Government, courts consider: "'(1) whether the Government knew of and acquiesced in the private search; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation.'" United States v. Wood, No. 3:22-CR-201-MOC-DCK, 2023 WL 1456792, at *1 (W.D.N.C. Feb. 1, 2023) (quoting Jarrett, 338 F.3d at 344).

Here, the Government argues that 3SI gave the data from the tracking device to law enforcement voluntarily and was otherwise not acting as a government agent.

11

However, it is not necessary to decide if 3SI was acting as an agent of the Government when it provided the data transmissions because Defendant did not have a reasonable expectation of privacy in that data.

### b. Reasonable Expectation of Privacy

"[A] search occurs for constitutional purposes only 'when an expectation of privacy that society is prepared to consider reasonable is infringed,' and '[o]fficial conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment.'" United States v. Stephens, 764 F.3d 327, 331 (4th Cir. 2014) (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984); Illinois v. Caballes, 543 U.S. 405, 408 (2005)) (internal citations omitted); see also United States v. Rose, 3 F.4th 722, 727 (4th Cir. 2021) (without "an objectively reasonable expectation of privacy in the items searched, an individual cannot claim protection under the Fourth Amendment") cert. denied, 142 S. Ct. 1676, 212 L. Ed. 2d 582 (2022) (internal citations omitted).

"The defendant bears the burden of showing a reasonable expectation of privacy in the property searched." Rose, 3 F.4th at 727.

In this case, Defendant, relying on United States v. Jones, 565 U.S. 400 (2012) and United States v. Carpenter, 585 U.S. ---, 138 S. Ct. 2206 (2018), argues that he had a reasonable expectation of privacy in information

12

regarding his personal movements and, consequently, that the Government's use of the data stream from the tracking device was improper.

In <u>Jones</u>, the Supreme Court concluded that the Government's installation of a GPS device on a vehicle and the Government's use of that device to monitor the vehicle's movements constituted a search for purposes of the Fourth Amendment.

Here, however, no tracking device was installed on Defendant's vehicle. Rather, the evidence indicates that the tracking device was attached to the bait bills which were taken by the suspect during the robbery. <u>See</u> <u>e.g</u>., <u>United States v. Jones</u>, 31 F.3d 1304 (4th Cir. 1994) (Postal inspectors' placement of an electronic tracker in a bank deposit bag after bank deposit bag had been stolen was not a search because "[t]he beeper was not planted in the van; it was concealed in a mail pouch which belonged to the government and in which Jones had no expectation of privacy whatsoever. The mail pouch with the beeper found its way into Jones' van only because Jones stole the pouch and hid it in the van himself.")

In <u>Carpenter</u>, the Supreme Court found that a person maintains a legitimate expectation of privacy, for Fourth Amendment purposes, in the record of his physical movements as they are captured through cell site location information and, consequently, that the Government must generally

13

obtain a warrant, supported by probable cause, before acquiring cell site location information from a wireless carrier.

Here, though, 3SI and law enforcement were trying to track the cash that had been taken from the Bank during the robbery in the hopes of finding the robber. No evidence indicated that Defendant had a reasonable expectation of privacy either in the GPS device or in the data that was produced by the device. To the contrary, Mr. Stevens testified that the Bank owned the device and 3SI owned the data stream. See Byrd v. United States, 584 U.S. ---, 138 S. Ct. 1518, 1529 (2018) ("No matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car.") (citing Rakas v. Illinois, 439 U.S. 128, 143, n. 12 (1978) ("'A burglar plying his trade in a summer cabin during the off season,' for example, 'may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate."'"); Jones, 31 F.3d at 1311 ("Here, the government has placed the electronic device in its own property. Only purloiners of such property need fear adverse consequences. Accordingly, we conclude that the postal inspectors' use of an electronic tracking device to monitor movement of the mail pouch did not constitute a search within the ambit of the Fourth Amendment.").

Because Defendant has not established that he had reasonable expectation of privacy in the bait bills, the tracker, or the transmissions being

made by the device, the use by law enforcement of the location data from the tracking device did not constitute a search for purposes of the Fourth Amendment. See United States v. Thomas, No. 21-4366, 2023 WL 4363652, *5 (4th Cir. July 6, 2023) (unpubl.) (per curiam) ("And where the government provides a basis for believing the property in question is stolen, [the Fourth Circuit] require[s] that the defendant show the opposite: that the property in fact belongs to him.") (citing United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981)).

### 2. Arrest of Defendant

Defendant also contends that his arrest was improper since "all of the evidence relied upon to conclude that [Defendant] was the robber was the result of the unconstitutional search of [Defendant's] location information." Doc. 33 at 6.

As explained above, the undersigned does not find Defendant's argument that the Government's use of the data from the tracking device was unconstitutionally obtained to be persuasive.

In addition, the use of that information provided sufficient grounds upon which to stop Defendant's vehicle and arrest Defendant.

A law enforcement officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v.

15

Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). "A reasonable suspicion exists when law enforcement officers possess 'a particularized and objective basis' for suspecting the person stopped of criminal activity." United States v. Singh, 363 F.3d 347, 355 (4th Cir. 2004) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)) (internal citations omitted).

Further, "[a] police officer may make a warrantless arrest as long as he has probable cause to do so." United States v. Lesane, 498 F. App'x 363, 366 (4th Cir. 2012) (unpubl.) (citing United States v. Williams, 10 F.3d 1070, 1073 (4th Cir. 1993)). "Probable cause is present when the 'facts and circumstances within the officer's knowledge' are enough to justify a prudent person's belief 'that the suspect has committed, is committing, or is about to commit an offense.'" Id. (quoting Williams, 10 F.3d at 1073).

In this case, Sergeant Shae had reasonable suspicion to stop Defendant's vehicle. He had received information regarding the location of the tracking device that had been taken from the Bank and had followed that information until he encountered Defendant's vehicle, which he noted contained a single occupant and was traveling in a direction consistent with the movements of the tracking device. See e.g., United States v. Johnson, No. 13-14047-CR, 2014 WL 272664, at *9 (S.D. Fla. Jan. 23, 2014), (law enforcement officer properly stopped vehicle based on reasonable suspicion

where officer's decision to stop vehicle was based on "information he was receiving from a law enforcement dispatcher who related that the signal from the GPS money tracker was coming from that same road and specific vicinity").

Additionally, law enforcement had probable cause to arrest Defendant. In addition to the information available to Sergeant Shae at the time of the stop, other information was developed subsequently. A firearm, which appeared to be wrapped in plastic or some similar material, was discovered in Defendant's vehicle. Information was also relayed that the robbery suspect had fled using a bicycle, and a bicycle was discovered in Defendant's vehicle. Further, the GPS device was triggered to emit a chirp alarm and an alarm was heard coming from the inside of Defendant's vehicle.

The undersigned will, therefore, recommend that Defendant's Motion to Suppress – Cash Tracker be denied.

### B. The Motion to Suppress – Tennessee Hotel Search

By the Motion to Suppress – Tennessee Hotel Search, Defendant seeks the exclusion of evidence that was obtained from the search of a hotel room which law enforcement had identified through a recorded jail call made by Defendant.

At the beginning of the hearing on September 28, 2023, the Government reported that it did not intend to introduce evidence obtained

17

from the search of the hotel room and, therefore, that this Motion should be denied as moot.[4] Defendant concurred.

## IV. Recommendation

Based on the foregoing, the undersigned respectfully **RECOMMENDS** that:

(1) The Motion to Suppress – Cash Tracker (Doc. 33) be **DENIED**, and

(2) The Motion to Suppress – Tennessee Hotel Search (Doc. 36) be **DENIED AS MOOT**.

Signed: November 6, 2023

W. Carleton Metcalf
United States Magistrate Judge

---

[4] The Government did indicate, however, that it believed the Court could consider the information obtained from the hotel room when deciding Defendant's separate motion that seeks the suppression of location data from Defendant's cell phone. See Doc. 35. That motion is the subject of a separate Memorandum.

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(B), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).